UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD MOOSDORF,

       Plaintiff,

v.                                  Case No. 05-73033
                                   Honorable Patrick J. Duggan

BRUCE KROT, RORY MCMANMON,
and CITY OF DEARBORN HEIGHTS,

       Defendants.
_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on _____.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
              U.S. DISTRICT COURT JUDGE

      This lawsuit arises from the arrest of Plaintiff for operating a motor vehicle under

the influence of liquor II and hindering, on September 23, 2004, by City of Dearborn

Heights Police Department Officers Bruce Krot ("Officer Krot") and Rory McManmon

("Officer McManmon")(collectively "Officers").  Plaintiff brings this lawsuit pursuant to

42 U.S.C. § 1983, alleging that the Officers violated his Fourth and Fourteenth

Amendment rights by unlawfully arresting and seizing him without probable cause inside

his home, by using excessive force to effectuate the arrest, and by maliciously

prosecuting him (Count III).  Plaintiff also alleges state law claims of false arrest and

imprisonment (Count I) and assault and battery (Count II) against the Officers.  Finally, Plaintiff alleges a Section 1983 claim against the City of Dearborn Heights ("City"), contending that the Officers' actions were pursuant to City customs, policies, or practices or, alternatively, that the City failed to properly supervise and discipline its officers. Presently before the Court is a motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure filed by the Officers and the City (collectively "Defendants").  The Court held a hearing on Defendants' motion on September 7, 2006.

## I.    Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348,

2

1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient

evidence upon which a jury could reasonably find for the non-movant; a "scintilla of

evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable

inferences" in the non-movant's favor. *See id.* at 255.  The inquiry is whether the evidence

presented is such that a jury applying the relevant evidentiary standard could "reasonably

find for either the plaintiff or the defendant."   *See id.*

## II.    Factual Background

Between 1:00 and 2:00 in the morning on September 23, 2004, Officers Krot and

McManmon were engaged in a traffic stop of a party unrelated to this action on Colgate

Street in the City of Dearborn Heights.  The Officers' patrol car and the unrelated vehicle

were stopped west of the intersection of Colgate and Bailey Street.  As the Officers were

seated in their patrol car checking the documents of the occupants of the stopped vehicle,

Officer Krot heard a car engine accelerating.  *See* Defs.' Mot. Ex. 1 at 8-9.  Officer Krot

looked up to see from where the noise was coming and witnessed a blue Ford Escort drive

northbound through the stop sign on Bailey and turn westbound onto Colgate toward the

Officers' patrol car.  *See id*.  The video camera on the Officers' patrol car, which had

been activated when the Officers' initiated their stop of the unrelated vehicle, recorded

the Escort's movements.  *See* Defs.' Mot. Ex. 4.  After the Escort turned onto Colgate, it

struck the north-side curb and then swerved away from a parked car.  *See* Defs.' Mot. Ex.

1 at 18-19, Ex. 2 at 7, & Ex 4.

3

Officer Krot, who was sitting in the front passenger seat of the patrol car, immediately exited the vehicle and ran into the street in order to flag down the driver of the Escort, which was Plaintiff.  *See* Defs.' Mot. Ex. 1 at 9.  Officer Krot flashed Plaintiff with the beam of his flashlight and yelled "hold up."  *See id*., Ex. 2 at 8, & Ex. 4.  At his deposition, Plaintiff recalled seeing the Officers and their patrol car with its lights flashing at the side of the road; however, he did not remember hearing anything as he drove past their car.  *See* Defs.' Mot. Ex. 5 at 15-16.  Plaintiff did recall that his window was halfway down.  *See id*. at 15.  According to Officer Krot, when he yelled at Plaintiff to stop, Plaintiff slowed down, told him to "F - - - off," and then drove away.  *See* Defs.' Mot. Ex. 1 at 9.

Officer Krot then saw Plaintiff pull into a driveway a short distance from where the patrol car was stopped.  *See id*. at 9-10.  Officer Krot ran towards the driveway, yelling at Plaintiff to not go into the house and to stay where he was.  *See id*. at 10.  Plaintiff testified that he did not hear the officer's commands.  *See* Defs.' Mot. Ex. 5 at 18.  Plaintiff proceeded to run towards a door at the side of the house, he then entered the house and slammed the door.  *See id*.  Officer Krot returned to Officer McManmon and told him what happened.  *See id*.

Officer McManmon, who still was involved with the unrelated party, suggested that they go back and tow Plaintiff's car.  *See id*. & Ex. 2 at 9.  The Officers then released the unrelated party and drove to Plaintiff's house.  According to Officer McManmon, when he got back into the patrol car to drive to Plaintiff's house, he instinctively turned

4

off the car's video recorder.  *See* Ex. 2 at 11.

Officer McManmon pulled the patrol car into Plaintiff's driveway and, over the car's "P.A." system, instructed Plaintiff to come out of the house.  *See id*. at 11-12. According to Officer McManmon, Plaintiff then exited the side door of the house.  *See id*. at 12.  When Plaintiff emerged, Officer McManmon realized that he had turned off the patrol car's video camera and so he reactivated it via the microphone attached to his belt.[1] *See id*. at 12-13.  At that point, as shown on the videotape, the Officers were standing outside the side door of Plaintiff's residence and Plaintiff was standing between the threshold and the storm door, which he was holding ajar.  *See* Defs.' Mot. Ex. 4.

According to Officer Krot, there subsequently was some "chatter" back and forth between the Officers and Plaintiff: the Officers repeatedly told Plaintiff that they would tow his car if he did not come out of the house; Plaintiff repeatedly asked the Officers whether they had a warrant to tow the car.  *See id*. & Ex. 1 at 12. When Plaintiff refused to come outside, the Officers began preparing a tow report.  *See id*. Ex. 1 at 14.  At that point, Plaintiff again opened the storm door, leaned outside, and yelled at the Officers that before they towed his car they needed to get a warrant.  *See* Ex. 4.  Officer McManmon

---

[1]In his response to Defendants' motion for summary judgment, Plaintiff makes much of the fact that the patrol car video tape shows nothing but static for about a minute and a half after the Officers released the unrelated party.  *See* Pl.'s Resp. at 3.  Plaintiff states that "[t]he most reasonable inference is that the deletion was deliberately done . . .." *See id*.  As Plaintiff does not allege that the Officers did anything wrong during that minute and a half, the Court sees no reason why they intentionally would have erased a portion of the tape or the relevance of Plaintiff's accusation.

responded: "I don't need a warrant smartass" and again instructed Plaintiff to come outside. *See id.* Officer McManmon then grabbed Plaintiff– who still was standing at the threshold holding the storm door ajar– and tried to pull him outside. *See id.*, Ex. 1 at 15 & Ex. 2 at 16-17. With Officer Krot's help, the Officers then pulled Plaintiff outside the house and directed him to place his hands on top of the Escort. *See* Ex. 1 at 15-16 & Ex. 4.

Officer Krot then administered a variety of sobriety tests. *See* Mot. Ex. 1 at 16. According to Officer Krot's report of the incident, Plaintiff's eyes were glassy, his speech was slurred, and he was unable to walk heel to toe and maintain his balance. *See id.* Ex. 3. Officer Krot then administered a Preliminary Breath Test, which registered Plaintiff's bodily alcohol content as 0.12.[2] *See id.* at 17. At that point, Officer Krot advised Plaintiff that he was under arrest. The Officers subsequently impounded Plaintiff's vehicle and transported him to the police station, where he was charged with operating a vehicle while intoxicated, second offense ("OUIL II"), and hindering a police investigation. *See id.*, Ex. 1 at 17 & Ex. 2 at 20. The charges against Plaintiff subsequently were dismissed.

Plaintiff testified at his deposition that, before the incident with the Officers, he had been bowling and at a bar. *See* Defs.' Mot. Ex. 10-12. According to Plaintiff, he consumed three to five beers at the bowling alley and a couple of beers and a couple of

---

[2]Under Michigan law, it is unlawful to operate a motor vehicle if the person has a bodily alcohol content of 0.08 grams or more per 100 milliliters of blood, per 210 liters of breath, or per 67 milliliters of urine. MICH. COMP. LAWS ANN. 257.625(1)(b).

shots at the bar. *See id.* at 11-12. After leaving the bar, he drove home. *See id.* At his

deposition, Plaintiff acknowledged rolling through the stop sign at the intersection of

Colgate and Bailey. *See id.* at 14. Plaintiff testified that the first time he heard the

Officers say anything to him was when they were in his driveway, yelling to him over the

patrol car's P.A. system to come out of the house. *See id.* at 16. According to Plaintiff,

after some yelling between himself and the Officers, they came into the house and yanked

him outside. *See id.* at 16-17. Plaintiff testified that the Officers then "threw" him on his

car, although he subsequently acknowledged that they simply directed him toward the car

and that he did not hit the car violently. *See id.* at 20. Plaintiff did not describe any other

force used by the Officers.

## III.    Applicable Law and Analysis

To succeed on a claim under Section 1983, a plaintiff must show that the

defendant acted under color of state law and deprived the plaintiff of rights, privileges, or

immunities secured by the Constitution or laws of the United States. *Bennett v. City of*

*Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). There is no dispute in the present case that

the Officers acted under color of state law. Defendants argue, however, that Plaintiff

cannot establish that the Officers violated his constitutional rights. Alternatively,

Defendants argue that the Officers are entitled to qualified immunity.

The Sixth Circuit has explained the qualified immunity defense as follows:

> "A government official who performs discretionary functions
> is entitled to qualified immunity from civil suits for damages
> arising out of the performance of his official duties unless his

7

> alleged conduct violated clearly established constitutional
> rights of which a reasonable person would have known."

*Bennett*, 410 F.3d at 819 (quoting *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir.

1995)).  To determine whether a defendant is entitled to qualified immunity, a court must

engage in a two-step analysis.  First, the court must determine whether a constitutional

violation has occurred.  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 2155 (2001).

Second, the court must decide whether the violation involved a clearly established

constitutional right.  *Id*.  "The relevant, dispositive inquiry in determining whether a right

is clearly established is whether it would be clear to a reasonable officer that his conduct

was lawful in the situation he confronted."  *Id*. at 202, 121 S. Ct. at 2156.  To make this

determination, the court must look to decisions of the Supreme Court, then to decisions of

the Sixth Circuit and other courts within the Circuit, and finally to decisions of other

Circuits.  *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993).

## A.    Whether the Officers Had Probable Cause to Arrest Plaintiff

In order to prevail on his claims of false arrest, false imprisonment, malicious

prosecution, and unlawful seizure in violation of the Fourth Amendment, Plaintiff must

prove that the Officers lacked probable cause to arrest him.  *Hinchman v. Moore*, 312

F.3d 198, 202 (6th Cir. 2002)(citations omitted).  Under Federal law, a determination of

whether probable cause exists "is based on the 'facts and circumstances within the

officer's knowledge that are sufficient to warrant a prudent person . . . in believing . . .

that the suspect has committed, is committing, or is about to commit an offense.'"  *Id*. at

8

204 (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)).  Similarly, under

Michigan law, "[p]robable cause to arrest exists where the facts and circumstances within

an officer's knowledge and of which he has reasonably trustworthy information are

sufficient in themselves to warrant a man of reasonable caution in the belief that an

offense has been committed or is being committed." *Id*. (quoting *People v. Champion*,

452 Mich. 92, 115, 549 N.W.2d 849, 860 (1996)). In their motion for summary judgment,

Defendants argue that the Officers had probable cause to arrest Plaintiff for OUIL II and

hindering in violation of Section 20-31 of the Code of Ordinances of the City of Dearborn

Heights.

   "It is only when an officer restrains an individual's liberty 'by means of physical

force or show of authority' that Fourth Amendment protections attach." *Bennett*, 420

F.3d at 821 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868 (1968)).  "A

person's liberty is restrained if a reasonable person in the circumstances would not

believe that [he] were free to leave and ignore the officer's requests." *Id*.  The Court will

assume, for purposes of this motion, that the Officers restrained Plaintiff when they

pulled him out of his house and placed him against his car.  At that time, the Officers only

*suspected* that Plaintiff had been driving under the influence of alcohol.  Only afterward,

when Officer Krot completed several sobriety tests and closely observed Plaintiff, did

they have probable cause to arrest him for OUIL.  The Officers, however, did have

probable cause to arrest Plaintiff for hindering in violation of City Ordinance Section 20-

31.

Section 20-31 provides: "No person shall hinder, resist or oppose any city officer or employee, including police officers and fire fighters in the performance of their duties." *See* Mot. Ex. 6. Before the Officers seized Plaintiff, they observed him drive through a stop sign, swerve in the road, and drive up a curb. At that point, the Officers had the authority to stop Plaintiff's vehicle, if not for a suspected OUIL violation, at least for ignoring a traffic signal. *See* Dearborn Heights Ordinance 32-129(a) (granting police officers witnessing a civil infraction the right to stop and detain the violator). Officer Krot ran into the street, flashed Plaintiff with the light of his flashlight, and yelled for Plaintiff to stop. Officer Krot then followed Plaintiff to his home and, as Plaintiff exited his vehicle, again told him to stop and to not enter his house. As it appeared to Officer Krot, Plaintiff ignored all of the officer's commands.

Notably, under Section 32-214 of the City's Code of Ordinances, a driver of a motor vehicle is guilty of a misdemeanor if the person "is given a visual or audible signal by hand, voice, emergency light, or siren by a police officer who is acting in the lawful performance of his duty and who is directing the driver to bring his motor vehicle to a stop and the driver willfully fails to obey such direction by increasing his speed . . . or otherwise attempting to flee or elude the officer." Further, under Michigan Law, it is a felony to obstruct a law enforcement officer in the performance of his or her duties. MICH. COMP. LAWS ANN. § 750.479. The statute defines "obstruct" as including "the use or threatened use of physical interference or force *or* a knowing failure to comply with a lawful command." MICH. COMP. LAWS ANN. § 750.479(8)(a) (emphasis added).

10

**B.     Whether the Officers Violated Plaintiff's Fourth Amendment Rights by Entering His Home to Effectuate His Seizure**

Even if the Officers had probable cause to arrest Plaintiff, the Fourth Amendment generally prohibits searches and seizures inside a home without a warrant. *Payton v. New York*, 445 U.S. at 573, 586, 100 S. Ct. 1371, 1380 (1980). As the Supreme Court held in *Payton,* warrantless arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances. *Id*. at 583-90, 100 S. Ct. at 1378-82. The Supreme Court has observed that ". . . exceptions to the warrant requirement are few in number and carefully delineated." *Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S. Ct. 2091, 2097 (1984)(citation and quotation marks omitted). The Sixth Circuit has found exigent circumstances in the following three instances: (1) hot pursuit of a fleeing suspect; (2) when the suspect represents an immediate threat to the arresting officers or the public; and (3) when immediate police action was necessary to prevent the destruction of vital evidence or thwart the escape of known criminals. *Lyons v. City of Xenia*, 417 F.3d 565, 586 (6th Cir. 2005). The Court concludes that the hot pursuit doctrine justifies the Officers' seizure of Plaintiff inside the threshold of his home.

The Officers witnessed Plaintiff's erratic driving and traffic violation. One of the officers immediately attempted to stop Plaintiff, pursued Plaintiff to his home, and thereafter commanded Plaintiff to not enter his home and then– once Plaintiff apparently ignored this command and went inside– ordered him to come outside. As indicated previously, the knowing failure to comply with a lawful command of a law enforcement

11

officer constitutes a felony under Michigan law.[3]  The fact that Officer Krot did not

attempt to seize Plaintiff when he first followed Plaintiff to his driveway, but instead

returned to Officer McManmon, did not, in this Court's view, cool down the Officers' hot

pursuit of Plaintiff.

Moreover, Plaintiff was standing inside his open storm door when he was seized.

He was in, as the Supreme Court described in *United States v. Santana*, a "public" place:

> While it may be true that under the common law of property
> the threshold of one's dwelling is "private," as is the yard
> surrounding the house, it is nonetheless clear that under the
> cases interpreting the Fourth Amendment Santana was in a
> "public" place.  She was not in an area where she had any
> expectation of privacy.  "What a person knowingly exposes to
> the public, even in his own house or office, is not a subject of
> Fourth Amendment protection."  *Katz v. United States*, 389
> U.S. 347, 351, 88 S. Ct. 507, 511, 19 L.Ed.2d 576 (1967).
> She was not merely visible to the public but was as exposed to
> public view, speech, hearing, and touch as if she had been
> standing completely outside her house. . . . Thus, when the
> police, who concededly had probable cause to do so, sought to
> arrest her, they merely intended to perform a function which
> we have approved . . ."

427 U.S. 38, 42, 96 S. Ct. 2406, 2409 (1976).  When the officers in *Santana* approached a

home from where they had been informed heroin had just been sold, a woman was

---

[3]Although Plaintiff contends that he did not hear Officer Krot's commands to stop
his vehicle before he entered his driveway, and possibly did not hear the Officer's
command to not enter the house, Plaintiff acknowledges hearing the Officers' commands
to exit the house when they were at his side door.  *See supra* at 5-6.  However, even if in
fact Plaintiff did not hear the Officers' instructions, the Officers believed Plaintiff had
heard them and was ignoring their commands and thus they had probable cause to arrest
Plaintiff for the felony of "obstruction."

standing in the doorway holding a brown paper bag.  *Id*. at 40, 96 S. Ct. at 2408.  The officers exited their vehicle, displayed their identification, and shouted "police."  *Id*. As they approached the house, however, the woman retreated into the home's vestibule. *Id*. The officers followed through the open door and seized the woman.  *Id*.  The Supreme Court concluded that the seizure was lawful, holding "that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper . . . by the expedient of escaping to a private place."  *Id*. at 43, 96 S. Ct. at 2410.

Notably, Plaintiff did not remain behind his storm door during his interaction with the Officers.  Instead, he repeatedly came outside, engaged in argument with the Officers, and then retreated indoors.  As the Eighth Circuit Court of Appeals commented in a similar case where officers entered a home to arrest a suspect after he went outside to yell at officers, only to retreat inside when they approached:

> Apparently Mr. Schmidt [the arrested individual] thought that the enforcement of the criminal laws resembles a children's game of tag where one is 'safe' if one reaches 'home' before being tagged by an officer.  . . . But *Santana* instructs that our criminal laws do not play such games.

*United States v. Schmidt*, 403 F.3d 1009, 1014 (8th Cir. 2004).  The court concluded that the defendant's engagement in this "game" rendered the facts "even more stark" than those in *Santana* to support a finding that the officer's arrest of the defendant inside his home did not violate the Fourth Amendment.  *Id*.  Similarly, and for the reasons set forth above, the Court concludes that the Officers' seizure of Plaintiff immediately inside the threshold of his home was lawful.

13

**Qualified Immunity**

Even if the Officers did violate the Fourth Amendment by seizing Plaintiff inside the threshold of his home, the Court does not believe that their conduct violated a clearly established constitutional right.  Accordingly, the Court concludes that Defendants are entitled to summary judgment based on qualified immunity with respect to Plaintiff's claim that they wrongfully seized him inside his home.

**C.     Whether the Officers Used Excessive Force in Effectuating Plaintiff's Arrest**

At the motion hearing, Plaintiff's counsel acknowledged that Plaintiff's excessive force claim fails if the Officers' seizure was lawful.  Therefore, as the Court finds the Officers' seizure lawful, it concludes that Defendants are entitled to summary judgment on this claim.

**D.      Whether the Officers Unlawfully Seized Plaintiff's Automobile**

Although not alleged in his complaint, Plaintiff asserts in response to Defendants'

motion for summary judgment that the Officers wrongfully seized his automobile.  *See*

Pl.'s Resp. Br. at 9-10.  Plaintiff argues that Defendants had no legal basis for towing his

car which was legally parked in his driveway.  *See id.* at 10.  In fact, under Michigan law,

the officers possessed the authority to impound Plaintiff's vehicle under the

circumstances of this case.  MICH. COMP. LAWS ANN. § 257.252d.  Section 257.252d

provides, in relevant part:

> (1) A police agency or a governmental agency designated by
> the police agency may provide for the immediate removal of a
> vehicle from public *or* private property to a place of
> safekeeping . . . in any of the following circumstances:
>
> . . .
>
> (e)  If the vehicle must be seized to preserve evidence of a
> crime, or if there is reasonable cause to believe that the
> vehicle was used in the commission of a crime.

MICH. COMP. LAWS ANN. 257.252d (emphasis added).

When the Officers impounded Plaintiff's vehicle, they already had determined that

he was legally intoxicated and that he had been operating his vehicle.  The Officers also

knew that this was Plaintiff's second offense for operating a motor vehicle under the

influence of liquor.  As the vehicle was used in the commission of a crime, the Officers

lawfully seized the vehicle pursuant to Section 257.252d.

15

### E.     The City's Liability

As the Court finds that the conduct of the City's Officers did not violate Plaintiff's constitutional rights, the Court concludes that summary judgment also should be granted in the City's favor.

## III.     Conclusion

For the reasons set forth above, the Court concludes that Defendants' are entitled to summary judgment with respect to the claims set forth in Plaintiff's complaint.  In response to Defendants' motion, Plaintiff states that he should be allowed to amend his complaint "if this Court finds that Plaintiff's complaint is legally deficient in any manner."  *See* Pl.'s Resp. Br. at 18.  Plaintiff fails to indicate what additional claims he would allege in an amended complaint, much less why such claims would be viable, and the Court does not believe that any amendment would save his current claims.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is **GRANTED**.

                                        s/PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE

Copies to:
Thomas E. Kuhn, Esq.
Jeffrey R. Clark, Esq.

16